[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10031

_____

D.C. Docket No. 1:13-cv-21126-KMM

WALTER GOMEZ,
a Florida Resident,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA,
OFFICER JOHN DOE,
in his individual and official capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 11, 2015)

Before HULL and JULIE CARNES, Circuit Judges, and ROTHSTEIN,[*] District
Judge.

_____

[*]Honorable Barbara J. Rothstein, United States District Judge for the Western District of
Washington, sitting by designation.

HULL, Circuit Judge:

Plaintiff-appellant Walter Gomez appeals the district court's dismissal of his civil rights complaint against defendants-appellees Officer John Doe and the United States, filed pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and the Federal Tort Claims Act (FTCA). The district court dismissed, pursuant to Federal Rule of Civil Procedure 12(b)(6), Gomez's false arrest and excessive force claims against Officer Doe, and Gomez's false arrest and battery claims against the United States.[1] After a careful review of the record and the briefs, and with the benefit of oral argument, we affirm.

## I. BACKGROUND[2]

On April 27, 2010, approximately four United States Immigration and Customs Enforcement officers arrived at plaintiff Gomez's residence in Homestead, Florida. The officers were executing an arrest warrant for Rene Rodriguez, Gomez's father. Gomez, who was then 17 years old, and his mother

---

[1]Gomez also alleged, and the district court dismissed, a claim against the United States for intentional infliction of emotional distress. We do not address this claim because Gomez failed to raise any argument about it in his initial brief. See Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1306 (11th Cir. 2012) (arguments not raised in appellant's initial brief are abandoned).

[2]Because Gomez's complaint was dismissed pursuant to a Rule 12(b)(6) motion for failure to state a claim, we recite the facts "accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff." Chaparro v. Carnival Corp., 693 F.3d 1333, 1335 (11th Cir. 2012).

moved outside and stood on the front porch of the residence when the officers arrived. The officers asked if Gomez was a United States citizen and requested identification. Gomez responded that he was a citizen and produced his driver's license. The plaintiff and his mother stayed outside on their porch.

At this time, two women from the Everglades Housing Group then arrived by car at the scene. It was agreed that they would take Gomez away from the scene and to their office.

As Gomez and the women moved toward the car in order to leave the premises, Officer Doe[3] and another officer confronted Gomez's mother. Officer Doe yelled at Gomez's mother, using obscenities towards her. Gomez told Officer Doe he did not need to yell at his mother.

Gomez then had his back to Officer Doe. Officer Doe approached Gomez from behind and positioned himself so that when Gomez turned, Gomez unintentionally bumped into Officer Doe. When Gomez turned and bumped into him, Officer Doe screamed, "you touched me"; "he has to be arrested"; and "resisting! resisting!" Officer Doe then grabbed Gomez by the neck, choked him, and slammed him against the passenger side of the vehicle. After slamming Gomez into the car, Officer Doe demanded to know Gomez's immigration status, and Gomez informed him that another officer had already checked his status.

---

[3]Gomez does not know the officer's identity but refers to the unknown officer as Officer "Doe."

3

Doe then handcuffed Gomez and asked if he had any sharp objects on him, and Gomez said he only had his keys. Officer Doe stated that Gomez would be "raped by black men" when "[Gomez] was in the jail." Doe then searched Gomez's pockets and confiscated Gomez's keys. Gomez was subsequently released.

Gomez did not allege the length of time for which he was temporarily detained. Gomez also does not allege the length of time for which he was choked or handcuffed. And Gomez does not allege where Officer Doe placed him after slamming him into the vehicle.

During this encounter, Gomez never physically or verbally resisted Officer Doe.

Gomez subsequently filed a complaint against Officer Doe and the United States alleging civil rights violations. Gomez later amended his complaint and alleged two counts against Officer Doe—false arrest and excessive force—brought pursuant to Bivens. Gomez's amended complaint also alleged three counts against the United States—false arrest, battery, and intentional infliction of emotional distress—brought pursuant to the FTCA. The defendants moved to dismiss.

In a memorandum order dated December 2, 2013, the district court granted the defendants' motion to dismiss. In its order, the district court first addressed Gomez's false arrest claim against Officer Doe. The district court concluded,

4

based on the facts alleged in Gomez's complaint, that Gomez's detention "did not constitute a full custodial arrest."  The district court held that Gomez's constitutional rights were not violated by his temporary detention pending the arrest of his father because "[t]he officers had an interest in preventing the flight of other possible law breakers or unlawful immigrants on the premises as well as an interest in protecting their own safety during the pendency of the arrest."[4]  The district court also dismissed Gomez's claim for false arrest against the United States, pursuant the FTCA, concluding that the finding of qualified immunity in favor of Officer Doe "precludes the analogous FTCA claim."

Turning to Gomez's excessive force and battery claims, the district court concluded that "the brief choking and slamming of Gomez against a vehicle" was de minimis force and that Officer Doe was therefore entitled to qualified immunity as to the excessive force claim.  The district court then reached the same finding as to Gomez's battery claim against the United States, which was governed by Florida law, pursuant to the FTCA.

Gomez timely appealed.

---

[4]The district court also stated that it would have arrived at the same conclusion through "the application of the broader principles set out in Terry v. Ohio," 392 U.S. 1, 88 S. Ct. 1868 (1968).

5

## II. STANDARD OF REVIEW

We review <u>de novo</u> a district court's grant of a Rule 12(b)(6) motion to dismiss, accepting all factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff.  <u>Butler v. Sheriff of Palm Beach Cnty.</u>, 685 F.3d 1261, 1265 (11th Cir. 2012).

Under Rule 12(b)(6), the plaintiff bears the "obligation to provide the 'grounds' of his 'entitlement to relief.'"  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964–65 (2007) (brackets omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  Indeed, "a complaint's factual allegations must be enough to raise a right to relief above the speculative level."  <u>Davis v. Coca-Cola Bottling Co. Consol.</u>, 516 F.3d 955, 974 (11th Cir. 2008) (internal quotation marks and brackets omitted).

We may affirm for any reason supported by the record, even if not relied upon by the district court.  <u>United States v. Al-Arian</u>, 514 F.3d 1184, 1189 (11th Cir. 2008).

## III. GOMEZ'S CLAIMS AGAINST OFFICER DOE

We begin our analysis of Gomez's appeal by reviewing our qualified immunity jurisprudence, and we then turn to Gomez's specific arguments.

6

## A.    Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"[5] Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 742, 122 S. Ct. 2508, 2516 (2002) (quotation marks omitted)).

Qualified immunity applies to a defendant who establishes that he was a government official "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991) (quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

The "threshold inquiry" in determining whether qualified immunity is appropriate is "whether plaintiff's allegations, if true, establish a constitutional violation." Pelzer, 536 U.S. at 736, 122 S. Ct. at 2513. If the plaintiff's allegations, taken as true, fail to establish a constitutional violation, qualified

---

[5]Our qualified immunity analysis is the same, regardless of whether the plaintiff files suit under 42 U.S.C. § 1983 or, as here, pursuant to Bivens. See Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 1696 (1999).

7

immunity attaches and the district court should dismiss the complaint.  Chesser v.

Sparks, 248 F.3d 1117, 1121 (11th Cir. 2001).

Even if the plaintiff alleges facts that would establish a violation of a

constitutional right, qualified immunity will shield the defendant from suit unless

the right was "clearly established at the time of the alleged violation."  Holloman

ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).  "The relevant,

dispositive inquiry in determining whether a right is clearly established is whether

it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted."  Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir.

2009) (quotation marks omitted).

"[W]e need not employ a rigid two-step procedure, but rather may exercise

our discretion to decide 'which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular

case at hand.'"  Gilmore v. Hodges, 738 F.3d 266, 273 (11th Cir. 2013) (quoting

Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009)).

## B.    Gomez's False Arrest Claim against Officer Doe

On appeal, Gomez states that "[t]he discrete issue before this Court is

whether [Gomez's] Fourth Amendment rights were violated when he was

unnecessarily detained in conjunction with the execution of the arrest warrant"

(emphasis added).  Gomez argues exclusively that the rule established in Michigan

8

v. Summers, 452 U.S. 692, 101 S. Ct. 2587 (1981)—allowing an officer to temporarily detain an individual who is present at a residence during the execution of a search warrant at the residence—does not apply to situations where police are executing arrest warrants.

At no point in his briefs does Gomez contend that Officer Doe's actions constituted an arrest, rather than a temporary stop or temporary detention.  Nor does he argue that Officer Doe's acts failed to meet the standard set out in Summers.  Id. at 702–03, 101 S. Ct. at 2594.  Rather, Gomez merely argues that because Summers involved a search warrant and this case involves an arrest warrant, the reasoning of Summers should not apply.  Thus, we consider only that argument.  See Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1306 (11th Cir. 2012) (arguments not raised on appeal are abandoned).

1.    Temporary Detention Claim under the Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  This Court's Fourth Amendment jurisprudence long has identified three categories of encounters between citizens and police: (1) "police-citizen communications involving no coercion or detention"; (2) "brief seizures or investigative detentions"; and (3) "full-scale arrests."  United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989).

9

The first category of encounters, involving no coercion or detention, does not implicate the Fourth Amendment. Id. The second category includes temporary detentions, which are permissible where an officer has a "reasonable, articulable suspicion that criminal activity is afoot," Illinois v. Wardlow, 528 U.S. 119, 123, 120 S. Ct. 673, 675 (2000), or where an exception to general Fourth Amendment principles exists, see, e.g., Summers, 452 U.S. at 705, 101 S. Ct. at 2595 (detention of individuals present at a residence during the execution of a search warrant). The third category consists of full arrests, which must be supported by probable cause and includes arrests arising out of seizures that began as temporary detentions. See United States v. Brignoni-Ponce, 422 U.S. 873, 881–82, 95 S. Ct. 2574, 2580 (1975) (noting that, after the conclusion of a temporary detention, "any further detention or search must be based on consent or probable cause"). We are presented here with the second category: a temporary detention.

2.      Michigan v. Summers

In Summers, police preparing to execute a search warrant saw the defendant walking out the front door of the target house and down the front steps. 452 U.S. at 693, 101 S. Ct. at 2589. Police "requested his assistance in gaining entry," required him to re-enter the house, "and detained him while they searched the premises." Id. After finding narcotics in the house and identifying the defendant

10

as an owner of the house, police arrested him, searched him, and discovered in his coat pocket an envelope containing heroin.  Id.

The Michigan Supreme Court held that the initial detention violated the defendant's Fourth Amendment rights and that the evidence of heroin found in his coat must be suppressed.  Id. at 694, 101 S. Ct. at 2590.  However, the United States Supreme Court reversed, holding that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  Id. at 705, 101 S. Ct. at 2595.

The Summers Court posited three law enforcement interests that justify detaining an individual present during the execution of a search warrant: (1) "preventing flight in the event that incriminating evidence is found"; (2) "minimizing the risk of harm to the officers"; and (3) facilitating "the orderly completion of the search," as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force."  Id. at 702–03, 101 S. Ct. at 2594.  The Summers Court noted, "We do not view the fact that [Summers] was leaving his house when the officers arrived to be of constitutional significance. The seizure of [him] on the sidewalk outside was no more intrusive than the detention of those residents of the house whom the police found inside."  Id. at 702

11

n.16, 101 S. Ct. at 2594 n.16.[6]  The Supreme Court thus held that, during a house search, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."  Id. at 702–03, 101 S. Ct. at 2594.

Although Summers expressly reserved judgment on "whether the same result would be justified if the search warrant merely authorized a search for evidence" instead of contraband, id. at 705 at n.20, 101 S. Ct. at 2595 n.20, the Supreme Court has subsequently indicated that the Summers exception is a broad, categorical rule and applied it again where the search warrant was "for, among other things, deadly weapons and evidence of gang membership," Muehler v. Mena, 544 U.S. 93, 95–96, 125 S. Ct. 1465, 1468 (2005).  The plaintiff in Muehler was asleep in the home, was awakened and moved to the garage, was asked questions about her immigration status, and was detained even after it was clear she posed no safety threat to the officers.  Id. at 96–97, 125 S. Ct. at 1468–69.  The Supreme Court held that the plaintiff's "detention was, under Summers, plainly permissible."  Id. at 98, 125 S. Ct. at 1470.  It added that (1) "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed

---

[6]At the outset, the Supreme Court said the defendant was "descending the front steps" when detained, Summers, 452 U.S. at 693, 101 S. Ct. at 2589, but in a footnote said the seizure was "on the sidewalk outside" the defendant's home, id. at 702 n.16, 101 S. Ct. at 2594 n.16.

12

by the seizure," and (2) the plaintiff's "detention for the duration of the search was reasonable under Summers because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search." Id. at 98, 125 S. Ct. at 1470 (quotation marks omitted).

Subsequently, in Bailey v. United States, the Supreme Court noted that the categorical "rule in Summers extends farther than some earlier exceptions because it does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." 568 U.S. ___, ___, 133 S. Ct. 1031, 1037–38 (2013). The Supreme Court in Bailey held that the Summers rule is, however, spatially constrained to the "immediate vicinity" of the premises to be searched. Id. at ___, 133 S. Ct. at 1041. In Bailey, two occupants of a home left the scene prior to the officers making their presence known and commencing a search of the home pursuant to a search warrant. Id. at ___, 133 S. Ct. at 1036. The officers followed the occupants' car, stopped and detained them "about a mile" from the home, and brought them back for the duration of the search. Id. The Supreme Court held that the occupants were too far away to justify the detention: "Limiting the rule in Summers to the area in which an occupant poses a real threat to the safe and efficient execution of a search

13

warrant ensures that the scope of the detention incident to a search is confined to its underlying justification." Id. at 1042.[7]

Whether the categorical detention exception recognized by Summers in a search warrant context applies with equal force to the execution of an arrest warrant is an open question in this Circuit. Other circuits have indicated that the Summers exception also applies in the context of the police executing arrest warrants. See United States v. Enslin, 327 F.3d 788, 797 n.32 (9th Cir. 2003) (concluding that, "[a]lthough Summers involved a search pursuant to a search warrant rather than a consent search to execute an arrest warrant, much of the analysis remains applicable" and applying Summers in the arrest warrant context)[8]; Cherrington v. Skeeter, 344 F.3d 631, 638 (6th Cir. 2003) (stating in dictum that "the police have the limited authority to briefly detain those on the scene, even

---

[7]In Maryland v. Buie, the Supreme Court addressed the scope of searches incident to executing an arrest warrant, but that case did not involve the detention of another person who was not subject to an arrest warrant. 494 U.S. 325, 110 S. Ct. 1093 (1990). In Buie, the Supreme Court held that the police officers executing an arrest warrant could legally search areas in an arrestee's home "immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334, 110 S. Ct. at 1098. However, any larger protective sweep of the premises requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id.

[8]In Enslin, the police were executing an arrest warrant for a fugitive and entered a home where Enslin resided. 327 F.3d at 791. The Court held that requiring Enslin, who was in bed, to raise his hands from under the bed covers was a seizure but was a reasonable one for the officers' safety incident to the attempt to execute an arrest warrant for another person. Id. at 797–98.

wholly innocent bystanders, as they execute a search <u>or arrest warrant</u>" (emphasis added)).[9]

Before leaving <u>Summers</u>, we note that this Court has already cited and applied <u>Summers</u> to some extent to analyze what a police officer may lawfully do at the scene vis-à-vis detaining and controlling an innocent passenger during a traffic stop of a vehicle or a bystander on the sidewalk watching a fight. <u>See</u> <u>Hudson v. Hall</u>, 231 F.3d 1289, 1292 (11th Cir. 2000) (passenger during a traffic stop); <u>United States v. Clark</u>, 337 F.3d 1282, 1283 (11th Cir. 2003) (bystander to a fight). In those cases, this Court has noted that, "[a]s the Supreme Court has recognized, a police officer performing his lawful duties may direct and control— to some extent—the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing." <u>Hudson</u>, 231 F.3d at 1297 (citing, <u>inter alia</u>, <u>Summers</u>, 452 U.S. at 702–03, 101 S. Ct. at 2594)[10]; <u>see</u>

---

[9]<u>See also</u> <u>Katzka v. Leong</u>, 11 F. App'x 854, 855 (9th Cir. 2001) (unpublished) (holding that, "[a]lthough <u>Summers</u> dealt with execution of a search warrant, rather than an arrest warrant, its analysis applies equally" to justify the temporary detention of an individual who was present inside a house where police executed an arrest warrant).

[10]In <u>Hudson</u>, a police officer stopped a car after the driver turned onto a street without using his turn signal. 231 F.3d at 1292. The officer asked the driver and the two passengers to alight from the car. <u>Id.</u> All three complied. <u>Id.</u> The officer also asked all three for consent to search their persons, but one of the passengers, plaintiff Meadows, initially refused to consent. <u>Id.</u> The officer told Meadows, "If you don't want to be searched, start walking." <u>Id.</u> Meadows consented. <u>Id.</u> The officer reached into Meadows's pockets and looked into Meadows's shorts. <u>Id.</u>

Meadows sued, contending his consent to the search was coerced and thus the search violated his constitutional rights. <u>See id.</u> at 1297. Because no case held a similar command—to

15

Clark, 337 F.3d at 1286–87 (11th Cir. 2003) (citing Summers and stating that "the Supreme Court held that the 'risk of harm' to officers is 'minimized' when police officers 'exercise unquestioned command of the situation'").[11]

    3.    Gomez's False Arrest Claim against Officer Doe

Given that we have already utilized Summers before to analyze what an officer may lawfully do in non-search-warrant situations, we do so here too.

The temporary detention of plaintiff Gomez outside his residence occurred while the police were executing an arrest warrant for his father at the residence. Gomez thus was in the immediate vicinity of the execution of the arrest warrant. Prior to being detained, Gomez engaged Officer Doe verbally, essentially directing the officer not to yell at Gomez's mother. In addition, Gomez admits that he bumped into Officer Doe, albeit unintentionally. Given these particular

consent to search or start walking—was coercive, this Court concluded that the police officer was entitled to qualified immunity on Meadow's unlawful search claim. Id.

    [11]In Clark, an officer patrolling an Atlanta neighborhood at night "observed two men fighting or wrestling in the middle of the street" near an automobile that was "stopped on the wrong side of the street" with its lights on, one door open, and the engine running. 337 F.3d at 1283. The officer observed a bystander, plaintiff Clark, "standing on the sidewalk watching the fight" while "not engaged in any criminal activity." Id. The officer ordered the two men to stop fighting, and they did. Id. After discovering that Clark and the other two men had been in the nearby automobile, the officer "ordered all three men to reenter the vehicle and told them to sit where they had previously been sitting and to keep their hands where he could see them." Id.
        This Court concluded that the officer "did not violate the Fourth Amendment in briefly detaining Mr. Clark after learning that he was not a mere bystander but, instead and notably, had been a passenger in the automobile and an associate of two persons being investigated for criminal activities." Id. at 1288. In reaching this conclusion, this Court observed that "this is not a case where a law enforcement officer detained an individual who was in no way associated with any criminal wrongdoing, but rather was simply an unrelated bystander to a traffic violation or to an altercation between other persons." Id.

16

circumstances, we conclude that Officer Doe lawfully and reasonably directed and controlled the movement of Gomez in conjunction with the safe and efficient execution of the arrest warrant.  We need not reach the issue of whether to adopt Summers's broad, categorical rule for all arrest-warrant cases, but decide only that, under the totality of the facts here, Officer Doe did not act unlawfully in detaining Gomez.

Alternatively, even if Officer Doe violated Gomez's Fourth Amendment rights by temporarily detaining him in this case in the absence of reasonable suspicion or probable cause, it would not have been "clear to a reasonable officer that [Officer Doe's] conduct was unlawful in the situation he confronted."  See Kobayashi, 581 F.3d at 1308.  Because Officer Doe did not violate a clearly-established right, he was entitled to qualified immunity as to Gomez's temporary-detention claim.[12]

## C.    Gomez's Excessive Force Claim against Officer Doe

On appeal, Gomez contends that the district court erred by dismissing his excessive force claim because "de minimis force is actionable where a defendant is not legally entitled to seize the plaintiff."  Gomez's principal claim is that Officer

---

[12]Again, we note that Gomez abandoned any argument that he was arrested, or that, even if Summers applies, this is the "unusual case" that "might lead to a different conclusion" due to "special circumstances."  See Summers, 452 U.S. at 705 n.21, 101 S. Ct. at 2595 n.21.

17

Doe was not entitled to detain him and thus any use of force whatsoever, even de minimis, was actionable.

1.    The Use of Force on Gomez

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Ferraro, 284 F.3d at 1197.  The reasonableness of a seizure "depends on not only when a seizure is made, but also how it is carried out." Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699 (1985).  "The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002).  "Use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quotation marks omitted), modified on other grounds, 14 F.3d 583 (11th Cir. 1994).

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).  All claims "that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed

18

under the Fourth Amendment and its 'reasonableness' standard." Id. at 395, 109 S. Ct. at 1871. The use of de minimis force ordinarily will not be actionable. See Vinyard, 311 F.3d at 1348–49 n.13.

Nonetheless, Gomez is correct that, "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." Reese v. Herbert, 527 F.3d 1253, 1272 (11th Cir. 2008) (citation and quotation marks omitted). However, because Officer Doe was entitled to detain Gomez, the district court did not err in dismissing Gomez's excessive force claim against Officer Doe insofar as Gomez seeks to allege a Fourth Amendment excessive-force violation based on an unlawful detention.

2.    Gomez's Other Excessive Force Argument

On appeal, it is not clear whether Gomez preserved an additional argument that, assuming Officer Doe could detain him, his use of force was excessive during a lawful detention. Even assuming that Gomez properly preserved this issue, this argument lacks merit, too.

Although the use of force in a detention or an arrest must be judged on a case-by-case basis, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000). This Court has held that a variety of physical force techniques used by police on unhandcuffed individuals

19

constituted de minimis force that does not rise to excessive force that could violate the Fourth Amendment.  See Croom v. Balkwill, 645 F.3d 1240, 1245 (11th Cir. 2011) (plaintiff alleged that, during the execution of a search warrant at a residence plaintiff was visiting, an officer pushed the unhandcuffed plaintiff from a squatting position to the ground, placed a foot on the plaintiff's back for up to ten minutes, and "click[ed]" her gun during that time); Nolin, 207 F.3d at 1255 (during the course of an arrest, an officer grabbed an unhandcuffed plaintiff from behind by the shoulder and wrist, threw the plaintiff against a van, kneed the plaintiff in the back, pushed the plaintiff's head into the side of the van, searched the plaintiff's groin area, and then handcuffed him); Jones v. City of Dothan, Ala., 121 F.3d 1456, 1460 (11th Cir. 1997) (police officers looking for a suspect in a harassment case seized a plaintiff, "slammed" the unhandcuffed plaintiff against a wall, kicked the plaintiff's legs apart, and caused the plaintiff pain by requiring him to raise his arms above his head)[13]; Post, 7 F.3d at 1559 (during the course of an arrest, plaintiff alleged that an officer placed the unhandcuffed plaintiff in a choke hold for about five seconds).

On the other hand, the application of gratuitous force on an already-handcuffed and compliant detainee or arrestee constitutes excessive force in

---

[13]The Jones Court did not use the phrase "de minimis force," but we have since described Jones as being part of the line of cases establishing the de minimis force doctrine.  See Nolin, 207 F.3d at 1256; Vinyard, 311 F.3d at 1348–49 n.13.

20

violation of the Fourth Amendment, even if there is no visible or compensable injury. See Saunders v. Duke, 766 F.3d 1262, 1265, 1270 (11th Cir. 2014) (denying qualified immunity where officers allegedly slammed an already-handcuffed arrestee's head against the pavement with extreme force and stating also that "a plaintiff claiming excessive force under the Fourth Amendment can seek nominal damages if he does not have compensable injuries"); Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) (concluding that an officer used excessive force when he punched an individual in the stomach while the individual was handcuffed and not struggling or resisting); Slicker v. Jackson, 215 F.3d 1225, 1231–32 (11th Cir. 2000) (holding that a plaintiff could seek nominal damages based on pain and suffering where officers kicked and beat the handcuffed plaintiff).

Here, the force used by Officer Doe was applied before Gomez was handcuffed. Gomez's allegations are thus most closely analogous to the line of cases in which this Court has held that the amount of force used on unhandcuffed individuals was de minimis and did not rise to excessive force that could violate the Fourth Amendment. See Nolin, 207 F.3d at 1255; Jones, 121 F.3d at 1460; Post, 7 F.3d at 1559. Accordingly, under our precedent, and even if Gomez preserved this argument, we cannot say the district court erred in dismissing his excessive force claim.

21

## IV. GOMEZ'S CLAIMS AGAINST THE UNITED STATES

### A.     Gomez's False Arrest Claim against the United States

On appeal, Gomez makes no argument that, even if Officer Doe was entitled to qualified immunity, the district court erred by dismissing his false arrest claim against the United States.[14]  Accordingly, Gomez has abandoned any remaining argument regarding his false arrest claim against the United States.  See T-Mobile USA, Inc., 691 F.3d at 1306.

Because we conclude that Officer Doe was entitled to qualified immunity, and because Gomez advances no argument as to why his false arrest claim against the United States was nonetheless wrongly dismissed, we conclude that the district court did not err in dismissing Gomez's false arrest claim against the United States.

### B.     Gomez's Battery Claim against the United States

Gomez contends on appeal that the district court erred by dismissing his battery claim against the United States because Florida law governs the claim and, under Florida law, the reasonableness of an officer's application of force is a question for the jury to decide.

The FTCA demands that federal courts apply the law of the situs state to determine whether a tort claim has been stated.  28 U.S.C. § 1346(b)(1).  Here, because the events giving rise to this lawsuit occurred in Florida, we apply Florida

---

[14]In fact, Gomez makes no argument in his briefs specifically regarding his false arrest claim against the United States.

22

law to Gomez's battery claim against the United States, brought pursuant to the FTCA.  Under Florida law, "an officer is liable for damages only where the force used is clearly excessive."  City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d Dist. Ct. App. 1996).

In this case, we have already concluded that the amount of force used was de minimis.  Therefore, we likewise conclude that Gomez has failed to allege facts that, if true, establish that the amount of force used was "clearly excessive," as required to establish a battery claim based on excessive force under Florida law.  Accordingly, Gomez has failed to state a claim upon which relief can be granted, and the district court did not err in dismissing Gomez's battery claim against the United States.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of Gomez's claims against Officer Doe and the United States.

**AFFIRMED.**

23