[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10815
Non-Argument Calendar
_____

D.C. Docket No. 3:13-cv-00580-BJD-JRK

WILLIAM DALE ELLIOTT,

Plaintiff-Appellant,

versus

OFFICER RICHARD B. WILCOX,
individually,
LIEUTENANT BENJAMIN ALLEN,
individually,
OFFICER ERMON L. BENTLEY,
individually,
OFFICER KERRY WAYNE TANNER,
individually,
DAVID B. SHOAR,
in his official capacity as Sheriff of St. Johns County, Florida,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 14, 2016)

Before ED CARNES, Chief Judge, MARCUS, and WILLIAM PRYOR, Circuit Judges.

PER CURIAM:

William Elliott appeals the district court's grant of summary judgment in favor of the defendants on his 42 U.S.C. § 1983 claims for false arrest and excessive force.

**I.**

We view the facts in the light most favorable to Elliott. See Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1352 (11th Cir. 2015).

Elliott, an officer in the Florida Army National Guard, lives in a neighborhood located in a subdivision in St. Johns County, Florida. A grassy trail runs between Elliott's neighborhood and another neighborhood in the subdivision. The subdivision owns the trail, but a power company has an easement across it to run power lines. The trail is located underneath those power lines.

Elliott was walking his dog along that trail when he encountered Richard Wilcox, a Florida Wildlife Conservation Commission (FWC) officer, who was out on patrol. Wilcox was patrolling the trail because he had received information from the power company and a local hunting club about trespassers in that area. He also saw a "No Trespassing" sign as he entered the trail. Wilcox believed that the power company owned the trail and that Elliott did not have permission to be there.

2

Wilcox informed Elliott that he was patrolling for the power company and that Elliott was trespassing on its land. Elliott replied that he was not trespassing because the subdivision owned the land and had put up the "No Trespassing" signs. Wilcox continued to insist that Elliott was trespassing and asked for his identification. Elliott refused to give him his identification because he did not realize that Wilcox was a law enforcement officer. As he began to walk away, an intern in Wilcox's truck alerted Wilcox that Elliott was apparently wearing an Army Combat Unit-ACU holster underneath his jacket. Wilcox asked Elliott if he was carrying a weapon. Elliott replied that he was and Wilcox demanded his concealed carry permit, which Elliott refused to produce. After Elliott continued walking away toward his home, Wilcox called his supervisor, Lieutenant Benjamin Allen, to report the encounter.

As Elliott neared his home, Wilcox drove up alongside him and again asked for his identification. Elliott once again refused. When he got home he put his weapon away (he does not specify where he put it) and called the St. Johns County Sheriff's Office and the subdivision security service to report the encounter.

The Sheriff's Office dispatched Officers Ermon Bentley and Kerry Tanner to the subdivision in response to Elliott's call. Bentley and Tanner went to the subdivision, where they met with Wilcox. Wilcox told them that he had encountered someone trespassing on the trail, that the person had a gun, and that he

3

had refused to give Wilcox his identification.  Wilcox took Bentley and Tanner to the trail, where he showed them the "No Trespassing" signs.  Bentley and Tanner, like Wilcox, believed that the power company owned the land.  All three officers then proceeded to Elliott's home (Wilcox obtained Elliott's address from the subdivision's security guards).

Bentley and Tanner arrived first.  They met Elliott and his wife outside his front door and began to discuss the encounter between Elliott and Wilcox.  They also patted down Elliott and did not find a weapon.  Wilcox arrived at Elliott's home during that discussion, left his vehicle, and began to move toward the front porch.  Wilcox told Elliott that he was under arrest, and either Bentley or Tanner told him to put his hands behind his back.  Elliott, who was holding his cell phone, then took his phone, hit the emergency unlock, began to turn around, handed the phone to his wife, told his wife to call his boss, and then put his hands behind his back.  Bentley and Tanner quickly moved to restrain Elliott.  They slammed him into a column on the front porch and then pushed him down onto the concrete driveway, while repeatedly yelling at him to "stop resisting."  One of them put his knee into Elliott's back, put Elliott's hands behind his back, handcuffed him, lifted him up, and put him into the squad car.  He was taken to the county jail, booked, and charged with armed trespass on property other than a structure, in violation of

4

Fla. Stat. § 810.09(2)(c), and resisting an officer without violence, in violation of Fla. Stat. § 843.02.  He was released the next day and the charges were dropped.

After his release, Elliott went to the hospital and was treated for cuts and bruises along his head and shoulder.  He did not need stitches.  He was also diagnosed with a chip fracture of the bone in his left arm and event-specific Post-Traumatic Stress Disorder.

Elliott filed a complaint under 42 U.S.C. § 1983 against Wilcox, Allen, Bentley, and Tanner.[1]  He alleged that all of them had falsely arrested him and conspired to violate his civil rights.  He also alleged that Bentley and Tanner had used excessive force when arresting him.  The district court granted the defendants' motions for summary judgment, finding that they were entitled to qualified immunity on the false arrest claims and that Bentley and Tanner did not use excessive force (and, even if they did, qualified immunity applied).  The court also concluded that Elliott did not present sufficient evidence to defeat summary judgment on his conspiracy claim.[2]

---

[1] Elliott also listed St. Johns County Sheriff David B. Shoar as a defendant, alleging § 1983 claims against him for municipal liability for false arrest and excessive force and Florida common law claims for false imprisonment and battery.  The district court granted Shoar's motion for summary judgment on the § 1983 claims and dismissed the Florida claims without prejudice.  Because Elliott does not mention those claims in his initial brief, he has abandoned them.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 680–82 (11th Cir. 2014).

[2] Elliott also moved for partial summary judgment on the § 1983 false arrest claims.  The district court denied that motion as well.

5

Elliott contends that the district court erred in granting summary judgment to the defendants on his false arrest and excessive force claims.  He has abandoned his conspiracy claim because he failed to raise that issue in his initial brief.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 680–82 (11th Cir. 2014).

## II.

"We review de novo a grant of summary judgment."  Mobley, 783 F.3d at 1352.  The purpose of qualified immunity "is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks and citation omitted).  "Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible."  Id. (quotation marks omitted).

To obtain qualified immunity, the defendants must show that they were acting within their discretionary duty.  Mobley, 783 F.3d at 1352.  There is no dispute that they were.  To overcome qualified immunity, Elliott must establish (1) that the defendants violated his constitutional rights and (2) that "the law clearly established those rights at the time of the alleged misconduct." Id. at 1352–53

6

(quotation marks omitted).  "We may address those two inquiries in either order."

Id.

## A.    FALSE ARREST

Elliott first argues that Wilcox, Bentley, Tanner, and Allen wrongfully

arrested him.  An arrest made without probable cause violates the Fourth

Amendment.  Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004).

Probable cause exists if "the facts and the circumstances within the collective

knowledge of the law enforcement officials, of which they had reasonably

trustworthy information, are sufficient to cause a person of reasonable caution to

believe that an offense has been . . . committed."  Madiwale v. Savaiko, 117 F.3d

1321, 1324 (11th Cir. 1997) (quotation marks omitted).  An officer is "entitled to

qualified immunity if there was arguable probable cause for the arrest."

Kingsland, 382 F.3d at 1232.  Arguable probable cause exists if "reasonable

officers in the same circumstances and possessing the same knowledge as the

[d]efendants could have believed that probable cause existed" for the arrest.  Von

Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990).

Reasonable officers in the defendants' shoes could have believed that

probable cause existed to arrest Elliott for armed trespass.  Florida law provides

that a "person who, without being authorized, licensed, or invited, willfully enters

upon or remains in any property other than a structure or conveyance" as to which

7

"notice against entering or remaining is given . . . by posting . . . as described [under Florida law]" commits the "offense of trespass on property other than a structure or conveyance." Fla. Stat. § 810.09(1)(a)(1). That person is guilty of a third degree felony if he is armed during the commission of that offense. Id. § 810.09(2)(c).

Wilcox saw a "No Trespassing" sign at the entrance to the trail, which gave him reasonable grounds to believe that Elliott was trespassing. See id. § 810.12 ("The unauthorized entry by any person into or upon any enclosed and posted land shall be prima facie evidence of the intention of such person to commit an act of trespass."). Contrary to Elliott's argument, it is irrelevant that the sign did not precisely comply with Florida's requirements for "No Trespassing" signs. See Hutton v. Strickland, 919 F.2d 1531, 1541 (11th Cir. 1990) ("In making probable cause decisions, law enforcement officers are not charged with knowing legal technicalities and nuances, but with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.") (quotation marks omitted). Whatever Elliott knew regarding who owned the land, or what he told Wilcox about his right to be on the trail, is also irrelevant because Wilcox believed that the power company owned that land and that Elliott was not allowed to walk the trail. See Jones v. Cannon, 174 F.3d 1271, 1283 n.4 (11th Cir. 1990) ("[W]hat counts for qualified immunity purposes relating to probable

8

cause to arrest is the information known to the defendant officers . . . at the time of their conduct, not the facts known to the plaintiff then or those known to a court later."); see also Hutton, 919 F.2d at 1542 (noting that we do not hold "arresting officers to knowledge of property law in determining probable cause"). Finally, Elliott does not dispute that he told Wilcox that he was armed.

Based on all of those facts, Wilcox had arguable probable cause to arrest Elliott for armed trespass. See id. at 1539–41 (concluding that officers had probable cause to arrest the plaintiffs for trespass under Florida law where the property was posted with a "No Trespassing" sign and the officers believed that the plaintiffs did not own the property). It follows that Allen, Bentley, and Tanner also had arguable probable cause for the arrest because they could rely on information that Wilcox gave them about his encounter with Elliott. See Madiwale, 117 F.3d at 1324; see also Voorhees v. State, 669 So. 2d 602, 609 (Fla. 1997) ("The fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers."). The court correctly granted summary judgment on the false arrest claims.[3]

---

[3] Because the defendants had arguable probable cause to arrest Elliott for armed trespass, we need not address the district court's findings (or the parties' contentions) about whether the defendants also had arguable probable cause to arrest Elliott for other crimes. See Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007) ("This court may affirm on any ground supported by the record.").

## B.    EXCESSIVE FORCE

Elliott next argues that Bentley and Tanner used excessive force when arresting him.  The Fourth Amendment "encompasses the right to be free from excessive force during the course of a criminal apprehension."  Mobley, 783 F.3d at 1353 (quotation marks omitted).  Bentley and Tanner are entitled to qualified immunity unless Elliott can show that "the law clearly established that [the] particular amount of force" they used was excessive.  Lee, 284 F.3d at 1198.

To show that the law was clearly established, Elliott must identify a "materially similar case that has already decided that what the [defendants were] doing was unlawful."  Id. (quotation marks omitted).  There is a "narrow exception" to that rule.  Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000).  If Elliott can show that Bentley and Tanner's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [them], notwithstanding the lack of caselaw," then they are not entitled to qualified immunity.  Id. (quotation marks omitted).  Under the general rule and narrow exception, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the [defendants were] doing violate[d] federal law" to overcome qualified immunity.  Id. at 927 (quotation marks omitted).

10

The only case Elliott points to as materially similar is <u>Smith v. Mattox</u>, 127 F.3d 1416 (11th Cir. 1997). <u>Smith</u> was a "very close case" in which the plaintiff was "barely" able to overcome qualified immunity. <u>Id.</u> at 1419. The officer told the plaintiff to "get down," and after he "docilely submitted to arrest" the officer broke his arm while handcuffing him. <u>Id.</u> at 1418. Elliott, however, did not "docilely" submit to arrest after he was told to put his hands behind his back — he took his phone, pressed a button on it, gave it to his wife, and then put his hands behind his back. <u>See id.</u> at 1420 (stating that the suspect was "offering no resistance <u>at all</u>"). The <u>Smith</u> opinion emphasizes that the plaintiff had suffered a broken arm that required surgery for multiple fractures. <u>Id.</u> at 1418, 1420. That injury is more severe than Elliott's injuries, and it indicates that a greater degree of force was involved in the <u>Smith</u> case. Because the <u>Smith</u> case is not materially similar to the present case, it does not clearly establish that Bentley and Tanner used excessive force. <u>See id.</u> at 1419 ("[If] case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.") (quotation marks omitted).

Nor can Elliott show that every reasonable officer in Bentley and Tanner's position would have known that the force was unlawful. <u>Priester</u>, 208 F.3d at 926–27. Their conduct was not egregious enough to be "so far beyond the hazy border between excessive and acceptable force that [they] had to know [they were]

11

violating the Constitution even without caselaw on point." Id. at 926 (quotation marks omitted); cf. Oliver v. Fiorino, 586 F.3d 898, 907–08 (11th Cir. 2009) (denying qualified immunity where the officers tasered an un-resisting person "at least eight and as many as eleven or twelve times over a two-minute span," even though he was "writhing in pain on the hot pavement and . . . had gone limp," because that force was "so plainly unnecessary and disproportionate that no reasonable officer could have thought" it was lawful); Priester, 208 F.3d at 923 n.1, 927–28 (denying qualified immunity because "no reasonable officer" could have believed it was lawful for an officer to order a 94-pound German Shepard to attack, unprovoked, a person suspected of stealing $20 in snacks from a golf shop who immediately submitted to arrest, and let that attack continue for at least two minutes while threatening to kill the person when he resisted). The district court did not err in granting summary judgment to Bentley and Tanner on Elliott's excessive force claims.

**AFFIRMED.**