**John TARPLEY and Fredesvinda Tarpley, Plaintiffs**

v.

**MIAMI-DADE COUNTY, Florida, and others, Defendants.**

Civil Action No. 15-20997-Civ-Scola

United States District Court, S.D. Florida.

Signed 07/20/2016

Filed 07/21/2016

Gregory Darnell Curtis, The Law Office of Gregory D. Curtis, P.A., Wendell Terry Locke, Locke Law, P.A., Plantation, FL, for Plaintiffs.

Erica Sunny Shultz Zaron, Miami, FL, for Defendants.

### Order on the Defendants' Summary Judgment

Robert N. Scola, Jr., United States District Judge

This matter is before the Court on Defendants Miami-Dade County, Hector Sanchez, Jose Sanchez, and Joe Williams's Motion for Summary Judgment as to all counts in Plaintiffs John and Fredesvinda Tarpley's Second Amended Complaint (ECF No. 38). (Mot., ECF No. 63.) Having reviewed the record, the parties' filings, the relevant law, and for the reasons explained below, the Court **grants in part** the Defendants' Motion for Summary Judgment (ECF No. 63) as to Counts 1 through 7 and Count 11 of the Second Amended Complaint. Because the Court declines to exercise supplemental jurisdiction as to the remaining state law claims,

the Court **dismisses without prejudice** Counts 8, 9, 10, and 12 of the Second Amended Complaint and **denies in part** the Defendants' Motion for Summary Judgment (ECF No. 63) as to those Counts.

### 1. Relevant Facts

On March 13, 2011, Plaintiff John Tarpley went to the USA Flea Market to secure a booth in order to sell women's accessories. (Defs.' SMF ¶ 1, ECF No. 64.) Tarpley parked his car at a car wash across the street from the main part of the Flea Market and then proceeded to the Flea Market. (*Id.* ¶¶ 2-3.) The Defendants assert that the Flea Market owns the car wash. (*Id.* ¶ 2.) However, Tarpley asserts, and provides the property records in support, that while the Flea Market and the car wash have the same owners, the Flea Market does not own the car wash. (Pl.'s SMF ¶ 2; Pl.'s Composite Exhibit, ECF No. 71-1.)

Once in the Flea Market, Tarpley began speaking to a woman he knew when an unidentified woman walked up to Tarpley and punched him in the mouth. (Defs.' SMF ¶¶ 4-5.) Afterwards, Tarpley spoke to Chief Turner, the now-deceased chief security officer of the Flea Market, who told Tarpley to call the police regarding the woman who punched him in the face. (*Id.* ¶¶ 6-7.) Tarpley then called the police and proceeded to wait outside of the Flea Market for their arrival. (*Id.* ¶ 7.)

Miami-Dade County Police Officer Withers responded to Tarpley's call at 12:29 p.m., and Tarpley told Officer Withers that he was the victim of a battery by a Flea Market employee. (*Id.* ¶ 9.) Officer Withers testified that Chief Turner told him that Tarpley was previously asked to leave the Flea Market. (*Id.* ¶ 10; Withers Depo. 6:22-25, ECF No. 64-3.) But Tarpley denies that Chief Turner previously told him to leave. (Pl.'s SMF ¶ 10.) Tarpley does

admit that Officer Withers later told him that Chief Turner "did not want [Tarpley] back on the property" and asked that Tarpley leave after his car wash was complete. (Pl.'s SMF ¶ 11-12; Tarpley Depo. 171:11-23; 172:24-173:22, ECF No. 64-1.) Officer Withers issued Tarpley a trespass warning, told Tarpley that he could be arrested if he returned to the Flea Market property, and instructed Tarpley to leave the Flea Market property. (Defs.' SMF ¶ 12.) Finally, Officer Withers gave Tarpley a "case card" relating to his alleged battery. (*Id.* ¶ 13.) Later, Officer Withers completed a written offense incident report relating to the alleged battery and referencing the trespass. (*Id.*)

Tarpley could not immediately leave, however, because Tarpley's car remained at the car wash and was in the middle of being washed. (*Id.* ¶ 14.) In the Second Amended Complaint, Tarpley alleged that "a vendor at the Flea Market was detailing his car." (Second Am. Compl. ¶ 19.) Tarpley asked Officer Withers to accompany him to the car wash, but Officer Withers refused and told Tarpley to ask Chief Turner. (Defs.' SMF ¶ 15.) Officer Withers then left the Flea Market at 1:16 p.m. (*Id.*) Tarpley then asked Chief Turner "did you not tell me to call the police?" and in response, Chief Turner told Tarpley to get off of his property and then put his hand on his gun. (*Id.* ¶ 16.)

Instead of getting his car, Tarpley retreated across the street, called the police a second time, and asked that they send a supervisor to the scene. (*Id.* ¶ 17.) This time, Defendants Officers Hector Sanchez and Jose Sanchez, arrived on scene at 1:45 p.m. (*Id.* ¶ 18.) The dispatch did not reference Tarpley or a car wash location and neither officer knew Tarpley. (*Id.* ¶¶ 20.) Upon arrival at the front of the Flea Market, the officers encountered Chief Turner who told them that (1) the police had is-

sued Tarpley a trespass warning and (2) Tarpley was located near his car at the car wash. (*Id.* ¶¶ 22-23.)

Tarpley had observed the officers arrive at the Flea Market, but the parties dispute whether the officers ever told Tarpley to return to the Flea Market. (*Id.* ¶ 24.) The Defendants point to Tarpley's written statement, which he previously identified as something he wrote (Tarpley Depo. 169:6-11), as evidence of Tarpley's motive for returning to the Flea Market. (Defs.' SMF ¶ 24.) In Tarpley's statement, he said that "when he [saw] the officers pull up [he] went back to the Flea Market because [he] thought it was a supervisor officer." (ECF No. 64-10.) Tarpley insists that the officers called him over to the Flea Market. (PL.'s SMF ¶ 24.) However, previously Tarpley agreed that his written statement did not mention anywhere that the officers called him over to the Flea Market. (Tarpley Depo. 185:5-8, ECF No. 64-1.) Despite his previous failure to mention the officers instructing him to return, he later testified that they motioned him onto the Flea Market property. (*Id.* at 186:6-25.)

Tarpley told the officers that he wanted to file a complaint against Chief Turner for failing to do his job and for threatening Tarpley. (*Id.* 25.) In front of the officers, Chief Turner approached Tarpley, poked Tarpley with his finger, and stated "[m]an, I have you removed from my motherf***ing property." (*Id.* ¶ 26.) At that time, Tarpley stated that he had a right to be on the Flea Market property and asked the police officers why they were not arresting Chief Turner for assault. (*Id.* ¶¶ 27-28.)

In response, Officer Hector Sanchez called dispatch to determine who issued Tarpley's trespass warning, spoke to Officer Withers to confirm the trespass warning (*Id.* 30-31), and then checked his computer to see if Tarpley had any outstanding warrants. (*Id.* ¶¶ 32.)

Officer Jose Sanchez testified that he spoke to Officer Hector Sanchez regarding whether they should arrest Tarpley and that they "didn't see a resolution to the problem ... [and] that [Tarpley] needed to be arrested." (J. Sanchez Depo., 7:18-23, ECF No. 64-5.; H. Sanchez Depo. 9:4-14, ECF No. 64-6 ("We were discussing to arrest him.")). Tarpley disputes this fact and cites to a transcript of deposition taken in 2011 in Tarpley's criminal case where Officer Jose Sanchez testified that they did not decide to arrest Tarpley until they "caught up to [Tarpley] at the station." (ECF No. 72-1 at 29:2-10.) But that does not contradict the police officers' testimony that they discussed arresting him at the flea market.

The Defendants state that Tarpley then got in his car and drove away (*Id.* ¶ 34), which Tarpley disputes, but he does not offer any evidence to the contrary. Tarpley himself testified that he "got [his] car on [his] own and [he] left, and [he] went. Because if [he] wouldn't have, they would have arrest[ed] [him] then." (Tarpley Depo. 202:22-24, ECF No. 64-2.)

After leaving the Flea Market, Tarpley went to the Northside Police Station to file a complaint. (Defs.' SMF ¶ 36.) He entered the station through the front door into the lobby. (*Id.* ¶¶ 38-39.) Once there, Tarpley spoke to Officer Crum through a glass window behind a counter. (*Id.* ¶ 39.) Defendant Sergeant Joe Williams was behind the glass window with Officer Crum. (*Id.* ¶ 40.) Sergeant Williams was unaware of anything that had occurred at the Flea Market earlier that day. (*Id.*) Tarpley told Officer Crum that he wanted to speak to a supervisor, but the parties dispute whether his hands were on the counter when he made that request. (*Id.* ¶ 41.)

The police station is within eyesight of the Flea Market, so Officers Jose and Hector Sanchez followed Tarpley to the

station and arrived one minute after Tarpley had arrived. (*Id.* ¶ 37.) The officers entered through the rear of the station and saw Tarpley in the lobby. (*Id.* ¶ 42.) The parties dispute what transpired next. (*Id.* ¶ 43-45, Pl.'s SMF 43-45, ECF No. 71.)

Officers Jose and Hector Sanchez testified that they told Tarpley that Tarpley was under arrest and to put his hands behind his back (Jose Sanchez Depo. 11:2-10, ECF No. 64-5; Hector Sanchez Depo. 12:7-11, ECF No. 64-6) and that Tarpley did not respond to the verbal command to put his hands behind his back (2011 Hector Sanchez Depo. 41:13-18, ECF No. 64-8). In contrast, Tarpley testified that the officers never told him to put his hands behind his back. (Tarpley Depo. 216:8-10, ECF No. 64-2.)

After Tarpley allegedly refused to put his hands behind his back, according to Officer Jose Sanchez's testimony, Tarpley said "for what?" and "no" and thereafter, the officers flanked Tarpley on each side and each officer grabbed one of Tarpley's arms. (2011 Jose Sanchez Depo. 30:18-27, ECF No. 64-9.) The officers testified that when they grabbed Tarpley's arms, he flinched, tightened up his arm muscles, and started struggling with the officers by moving back and forth. (*Id.*; 2011 Hector Sanchez Depo. 41:13-18, ECF No. 64-8.) The officers then choked Tarpley from behind, lifted him up, and directed him to the ground. (Defs.' SMF ¶ 47.) Tarpley struck his face on the ground during the arrest. (*Id.* ¶ 49.)

However, Tarpley offers a different story. He testified that Officers Jose and Hector Sanchez simply walked into the station and asked him "What the f*** are you doing here?" to which Tarpley responded that he came to file a complaint. (Tarpley Depo. 215:4-25, ECF No. 64-2.) Thereafter, according to Tarpley, Officer Hector Sanchez grabbed Tarpley around his neck and started choking him, and

Tarpley "was like, man, what you doing? I can't breathe. I can't breathe. I have seizures." (*Id.*) And that Officer Hector Sanchez responded, "I don't give a f***, shut your black ass up, n*gger[,]" lifted Tarpley up off the ground while Officer Jose Sanchez hit Tarpley on his side, and threw Tarpley face-first on the floor. (*Id.* at 216:1-7.) Under either version of the story, Tarpley does not dispute that the entire "takedown" took 5 seconds. (Pl.'s SMF ¶ 47.)

Thereafter, the parties agree that Tarpley suffered a seizure. (Defs.' SMF ¶ 50.) However, although Tarpley testified that the seizure occurred when his face hit the ground (Tarpley Depo. 238:3-10, ECF No. 64-2), the Defendants dispute that the seizure was caused by Tarpley's face hitting the floor. (*Id.* ¶ 52.) When Tarpley experiences seizures, his muscles go tense, his mind goes blank, and he does not have a memory of what happened during the seizure beyond where he was at the time. (*Id.* ¶ 50, 51.) Here, Tarpley does not recall what occurred after his seizure. (*Id.* ¶ 53.)

While Tarpley was on the floor, the officers handcuffed Tarpley. (*Id.* ¶ 54.) An additional seven to ten seconds lapsed between the time Tarpley was on the floor and the time the officers handcuffed him. (*Id.*) After the officers handcuffed Tarpley, no other force was used against him. (*Id.* ¶ 58.) Also during this time, Sergeant Williams told Tarpley to put his hands behind his back. (*Id.* ¶ 55.) At no time did Sergeant Williams believe that the officers needed help getting Tarpley's handcuffs on. (*Id.* ¶ 56.) Sergeant Williams testified that he had no reason to believe that the officers did not have probable cause to arrest Tarpley. (Williams Depo. 31:14-17, ECF No. 64-11.) Tarpley disputes this fact, but does not present any record evidence to the contrary.

When Tarpley woke up, he was in handcuffs. (Defs.' SMF ¶ 57.) Because Tarpley had a laceration on his face, Sergeant Williams called Fire Rescue. (*Id.* ¶ 59.) Tarpley testified that UM Hospital diagnosed him with a broken nose, but could not recall the details of his visit to the doctor including the doctor's name. (Tarpley Depo. 245: 13-25, ECF No. 64-2.) Tarpley was then taken to Miami-Dade County jail with his injuries. (Second Am. Compl. at ¶ 35, ECF No. 38.) That same day, he bonded out of jail. (*Id.* at ¶ 36.) On March 14, 2011, charges against Tarpley for trespass and resisting arrest without violence were filed. (*Id.* at ¶ 38.) After his arraignment, the charges were dropped "on or about October 17, 2011." (*Id.* at ¶ 39.)

On July 28, 2015, Plaintiff John Tarpley filed a complaint alleging 12 Counts against Miami-Dade County, Officer Hector Sanchez, Officer Jose Sanchez, and Sergeant Joe Williams. (ECF No. 24.) In response, the Defendants filed a motion to dismiss four of the counts in the amended complaint and a motion for a more definite statement as to Count 12 for loss of consortium. The Court denied the motion to dismiss but granted the Defendants' motion for a more definite statement as to Count 12. In response, the Plaintiffs filed a Second Amended Complaint. Counts 1 through 7 are 42 U.S.C. section 1983 claims against Officer Hector Sanchez, Officer Jose Sanchez, and Sergeant Williams as follows:

—Count 1: False Arrest Against Officer Hector Sanchez

—Count 2: False Arrest Against Officer Jose Sanchez

—Count 3: Excessive Use of Force Against Hector Sanchez

—Count 4: Excessive Use of Force Against Jose Sanchez

—Count 5: Malicious Prosecution Against Hector Sanchez

—Count 6: Malicious Prosecution Against Jose Sanchez

—Count 7: Failure to Intervene Against Joe Williams

Count 8 is a state law false arrest claim against Miami-Dade County; Counts 9 through 10 are for Intentional Infliction of Emotional Distress against Officers Hector and Jose Sanchez; Count 11 is for Spoliation of Evidence against Miami-Dade County; and Count 12 is for Loss of Consortium brought by Fedesvinda Tarpley against all of the Defendants. Tarpley has abandoned Count 11 for Spoliation of Evidence (Resp. 11, ECF No. 70), and concedes that the Court should grant summary judgment on this claim (*Id.* 12.)

## 2. Legal Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the ab-

sence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. The nonmovant's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court will not weigh the evidence or make findings of fact. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Morrison v. Amway Corp.,* 323 F.3d 920, 924 (11th Cir.2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. *Morris v. Ross,* 663 F.2d 1032, 1034 (11th Cir.1981), *cert, denied,* 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982).

### 3. Legal Analysis

### A. Counts 1 through 7: 42 U.S.C. Section 1983 Claims Against Officer Hector Sanchez, Officer Jose Sanchez, and Sergeant Williams

The Defendants allege that the Court should grant summary judgment as to Counts 1 through 7, because the officers are protected by qualified immunity. (Mot. 3, ECF No. 63.) "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kingsland v. City of Miami,* 382 F.3d 1220, 1231 (11th Cir.2004) (quotation

marks omitted). "Qualified immunity represents a balance between the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the fear of constant, baseless litigation." *Id.*

To claim qualified immunity, a public official must first establish that she was engaged in a "discretionary duty." *Mercado v. City of Orlando,* 407 F.3d 1152, 1156 (11th Cir.2005). Because it is undisputed that the officers were acting within their discretionary capacity, the burden shifts to Tarpley "to show that qualified immunity is not appropriate by satisfying a two-part inquiry": (1) that the official "violated a constitutional right"; and (2) that the "right was clearly established at the time of the incident." *Id.* The law requires that the right is "clearly established" to ensure that the public official is on notice that her conduct is unlawful before she is subjected to a suit. *Lewis v. City of W. Palm Beach, Fla.,* 561 F.3d 1288, 1291 (11th Cir.2009). "This objective-reasonableness test provides qualified immunity protection to 'all but the plainly incompetent or those who knowingly violate the law.'" *Kirkland v. Mosaic Fertilizer, LLC,* No. 8:14–CV–1715, 2015 WL 4042100, at *2 (M.D.Fla. July 1, 2015) (quoting *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir.1997)).

### (1) *The Officers Are Entitled to Qualified Immunity on Tarpley's Claims for False Arrest (Counts 1 and 2) and Malicious Prosecution (Count 5 and 6)*

Tarpley alleges that Officers Hector and Jose Sanchez violated his constitutional right to be free from unreasonable seizures, because they arrested him without probable cause. (Second Am. Compl. ¶ 49, ECF No. 38.) "A warrantless arrest without probable cause violates the Constitution and provides a basis for a

section 1983 claim." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226, 1232 (11th Cir.2004) (citations omitted) ("Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment."). The existence of probable cause at the time of arrest, however, constitutes an absolute bar to a section 1983 action for false arrest, id. at 1226. (citation omitted), or a section 1983 malicious prosecution claim, *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir.2010). Probable cause to arrest a person exists when reasonably trustworthy facts and circumstances lead a prudent person to believe that an individual has violated the law, is violating the law, or will violate the law. *Kingsland*, 382 F.3d at 1226. Accordingly, the Court must decide whether the officers carried their burden of demonstrating, as a matter of law, that probable cause existed to arrest Tarpley. *See id.*

 The officers arrested Tarpley for trespass after warning. (Mot. 6, ECF No. 63.) Trespass after warning occurs when a person "defies an order to leave, personally communicated to the offender by the owner of the premises or by an authorized person ...." Fla. Stat. 810.09(2)(b). The four elements necessary to support this claim are: "(1) the defendant willfully entered or remained on property; (2) other than a structure or conveyance; (3) without being authorized, licensed, or invited; (4) when notice against entering or remaining had been given to the defendant." *Seago v. Florida*, 768 So.2d 498, 500 (Fla. 2d DCA 2000).

Although the parties agree that Tarpley had been issued a trespass warning as to the Flea Market property, two critical disputes of fact exist: (1) whether Tarpley was on the Flea Market property when the officers arrived on the scene, i.e., whether the car wash was Flea Market property, and (2) whether the officers asked Tarpley to come onto to Flea Market property after they arrived.

First, it is undisputed that when the officers arrived Tarpley was at the car wash, which the Defendants assert is Flea Market property. (Defs.' SMF ¶ 2; Reply 2, ECF No. 74.) But merely because the Flea Market and the car wash are near one another and share the same owners does not mean that the car wash was Flea Market property or that the trespass warning extended to both properties. Without more, and construing the evidence in Tarpley's favor, this is like a person allegedly trespassing in a convenience store, being issued a trespass warning for the store, and then being arrested for trespass at a nearby gas station owned by the same person. And Tarpley's former testimony classifying the car wash as flea market property does not suddenly cause the trespass warning to encompass the car wash. (*Cf.* Reply 2, ECF No. 74.) Therefore, a dispute of fact exists as to whether the car wash is the Flea Market property, and by extension, whether Tarpley "willfully entered or remained on the property" or whether the officers provided Tarpley with notice against entering the "property." *Compare Seago*, 768 So.2d at 500 ("Having issued the trespass notice to Seago and then observing him on the premises, the officers had probable cause to believe that he had committed the offense of trespass.")

Second, the officers allege that when they arrived at the Flea Market, Tarpley left the car wash and approached them on the Flea Market property. Therefore, according to the officers, they had every reason to believe that Tarpley was committing a trespass. (Mot. 6-7, ECF No. 63.) Tarpley, on the other hand, insists that the officers motioned him over to the Flea Market. (Pl.'s SMF ¶ 24; Tarpley Depo. at 186:6-25, ECF No. 64-1.) Tarpley admits

that his written statement does not mention that the officers called him over to the Flea Market and instead states that "when he [saw] the officers pull up [he] went back to the Flea Market because [he] thought it was a supervisor officer." (ECF No. 64-10.) But one does not negate the other. The officers may have motioned for Tarpley to come over, to which Tarpley complied because he thought one of the officers was a supervisor. Therefore, a dispute of fact exists as to whether the officers "invited" Tarpley onto the Flea Market property. Accordingly, significant factual disputes exist as to whether the officers had actual probable cause to arrest Tarpley for trespass.

■■■ Nevertheless, if they lacked actual probable cause to arrest Tarpley, the officers had at least arguable probable cause to make the arrest. (Mot. 7, ECF No. 63.) "[O]fficers who make an arrest without probable cause are entitled to qualified immunity if there was arguable probable cause for the arrest." *Kingsland*, 382 F.3d at 1232. "[T]hat is, where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' the plaintiffs." *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir.2001) (quoting *Redd v. City of Enterprise*, 140 F.3d 1378, 1384 (11th Cir. 1998)); *see Jones v. Cannon*, 174 F.3d 1271, 1283 n. 3 (11th Cir.1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry.").

Reasonable officers in the Defendants' shoes could have believed that probable cause existed to arrest Tarpley for trespass. As noted by the Defendants, even Tarpley thought that the car wash was Flea Market property. (Reply 3, ECF No. 74.) Because the officers believed that the Flea Market owned the car wash, therefore, they believed that the car wash was

Flea Market property. At most, the officers' belief that the car wash was part of the Flea Market property was a "good faith," "reasonable mistake." *See Kingsland*, 382 F.3d at 1233 (explaining that arguable probable cause exists where a public official makes a "good faith," "reasonable mistake" in the legitimate performance of his or her duties). Because the officers believed that the car wash was Flea Market property, they could have believed that probable cause existed to arrest Tarpley for trespass when they saw Tarpley standing near his car at the car wash; therefore, they are entitled to qualified immunity. *See Elliott v. Wilcox*, 641 Fed.Appx. 893, 896–97, 2016 WL 158821, at *3 (11th Cir.2016) (affirming summary judgment for officer because he had arguable probable cause to arrest a plaintiff for trespass based on the officer's mistaken belief that a third-party owned the land).

### (2) *The Officers Are Entitled to Qualified Immunity on Tarpley's Claims for Excessive Use of Force (Counts 3 and 4)*

■■■ Tarpley claims that, even if the arrest was otherwise valid, the officers used excessive force during the arrest in violation of his constitutional rights. (Second Am. Compl. ¶ 58, ECF No. 38.) "Any claim that a law enforcement officer used excessive force—whether deadly or not—during a seizure of a free citizen must be analyzed under the Fourth Amendment's Reasonableness' standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (quoting *Graham v. M.S. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

■■■ "The Supreme Court has emphasized that there is no precise test or 'magical on/off switch' to determine when an officer is justified in using excessive or deadly force." *Garczynski*, 573 F.3d at

1166 (quoting *Scott v. Harris*, 550 U.S. 372, 382, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). Rather, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993), *modified*, 14 F.3d 583 (11th Cir.1994) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski*, 573 F.3d at 1166 (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). "Because this standard establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Post*, 7 F.3d at 1559

Tarpley asserts that Officers Hector and Jose Sanchez violated his constitutional right to be free from the use of excessive force when the officers grabbed him, choked him, and threw him face-first to the ground. The officers assert that they are entitled to qualified immunity. Because the parties agree that the officers were acting within their discretionary authority, the burden shifts to Tarpley to establish "that the official's conduct was clearly excessive and that the law governing the circumstances was clearly established at the time of the violation." *Kirkland v. Mosaic Fertilizer, LLC*, No. 8:14–CV–1715–T–24TGW, 2015 WL 4042100, at *6 (M.D.Fla. July 1, 2015); *see Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir.2010) ("Plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was already clearly established at the time of the violation.").

The officers argue that, even accepting Tarpley's version of the facts as true, the amount of force used was not clearly excessive and insufficient as a matter of law. In the Eleventh Circuit, it is well-established that "application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir.2000). Critical to the Eleventh Circuit's determination of de minimis versus excessive force, is whether or not a plaintiff was already handcuffed at the time the officers used force. *See Gomez v. United States*, 601 Fed.Appx. 841, 850 (11th Cir.2015) ("On the other hand, the application of gratuitous force on an already-handcuffed and compliant detainee or arrestee constitutes excessive force in violation of the Fourth Amendment, even if there is no visible or compensable injury.").

Here, it is undisputed that the officers used no force once Tarpley was in handcuffs. The Eleventh Circuit "has held that a variety of physical force techniques used by police on unhandcuffed individuals constituted de minimis force that does not rise to excessive force that could violate the Fourth Amendment." *Gomez*, 601 Fed. Appx. at 850; *see, e.g., Croom v. Balkwill*, 645 F.3d 1240, 1252 (11th Cir.2011) (affirming summary judgment where an officer pushed an elderly woman with arthritis "to the ground from her squatting position and [held] her there with a foot (or knee) in the back for up to ten minutes"); *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1460 (11th Cir.1997) (finding that an officer was entitled to qualified immunity where the officer "slammed" the plaintiff against a wall, "kicked his legs apart, required him to raise his arms above his head, and pulled his wallet from his pants" leading the plaintiff to experience "pain from having to lift his arms since he had previously suffered a stroke," "pain in his arthritic knee from having his legs kicked apart[,]" and require minor medical treatment). Therefore, Tarpley's allegations are "most

closely analogous to the line of cases in which [the Eleventh Circuit] has held that the amount of force used on unhandcuffed individuals was de minimis and did not rise to excessive force that could violate the Fourth Amendment." *Gomez*, 601 Fed. Appx. at 851.

██ Moreover, Tarpley failed to demonstrate that the law governing the circumstances was clearly established at the time of the alleged violation. "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir.2000) (citations omitted). The Eleventh Circuit "ha[s] said many times that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'" *Id.* (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). "In the context of Fourth Amendment excessive force claims, [the Eleventh Circuit] ha[s] noted that generally no bright line exists for identifying when force is excessive; [the Eleventh Circuit] ha[s] therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Priester*, 208 F.3d at 926 (citing *Smith*, 127 F.3d at 1419).

The officers correctly assert that Tarpley failed to point to a single case demonstrating that the law was clearly established that what the officers allegedly did amounted to a constitutional violation. (Reply 7, ECF No. 74.) To demonstrate that the law was clearly established,

> the plaintiff cannot point to sweeping propositions of law and simply posit that those propositions are applicable. Instead, the plaintiff must draw the court's attention toward a more particularized and fact-specific inquiry ... showing that there existed sufficient case law establishing the contours of his or her constitutional rights such that the unlawfulness of the defendant's conduct would have been apparent to a reasonable official in the same circumstances. If no such case law exists, then the defendant is entitled to qualified immunity.

*Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1395 (11th Cir.1994) (alterations in original) (quoting *Nicholson v. Ga. Dept. of Human Res.*, 918 F.2d 145, 147 (11th Cir. 1990)). In this case, however, Tarpley has done exactly what he cannot do in hopes of defeating qualified immunity. (*See* Resp. 8, ECF No. 70.) Instead of conducting a fact-specific analysis, Tarpley relies entirely on a reiteration of his allegations and cites to cases only for broad propositions of law. Therefore, because Tarpley fails to cite to even one similar case, let alone apply the law to the facts of his case, he has failed to satisfy his burden to establish that the law was clearly established. *See Haney v. City of Cumming*, 69 F.3d 1098, 1102 (11th Cir.1995) ("Should the plaintiff fail to show that the law was clearly established at the time in question, the individual defendant is entitled to qualified immunity.").

"A narrow exception exists to the rule requiring particularized case law to establish clearly the law in excessive force cases." *Priester*, 208 F.3d at 926. However, unlike other cases where plaintiffs have affirmatively argued that this exception should apply, *see Hoyt v. Cooks*, 672 F.3d 972, 978 (11th Cir.2012) ("Plaintiffs are correct in arguing that a right can be clearly established even in the absence of caselaw."), Tarpley does not even mention this exception or acknowledge the complete absence of factually analogous case law in his response. Even so, the officers' use of force here does not fall within the narrow exception.

"In order for the narrow exception to apply to qualified immunity, and for qualified immunity to be inappropriate, 'pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.'" *Kirkland,* 2015 WL 4042100, at *7 (quoting *Priester,* 208 F.3d at 927). "In other words, the facts and circumstances would lead *every* reasonable officer in [the officers'] position to conclude the force used was unlawful based on the circumstances of this case." *Id.* (citing *Priester,* 208 F.3d at 927). Here, the officers' use of force for a period of fifteen seconds incident to Tarpley's valid arrest would not lead every reasonable officer in these officers' position to conclude that the force used was unlawful. Accordingly, the Court must grant summary judgment in favor of the Defendants on Tarpley's claim for excessive use of force.

### (3) *Sergeant Williams is Entitled to Qualified Immunity on Tarpley's Claim for Failure to Intervene (Count 7)*

Tarpley argues that Sergeant Williams had a duty to intervene when Officers Hector and Jose Sanchez made a false arrest and used excessive force against Tarpley. (Second Am. Compl. ¶ 80, ECF No. 38.) "[I]t is clear that '[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.'" *Ensley v. Soper,* 142 F.3d 1402, 1407 (11th Cir.1998) (quoting *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986)). Yet, the Court has already concluded that Officers Jose and Hector Sanchez did not violate Tarpley's constitutional· rights via false arrest or excessive use of force.

Therefore, because Tarpley did not establish a constitutional violation, his claim for failure to intervene must also fail. *See Sanders v. City of Union Springs,* 207 Fed.Appx. 960, 966 (11th Cir.2006) ("[G]iven that the plaintiffs are unable to establish a constitutional violation, their claim for failure to intervene must fail."); *see also Grimes v. Yoos,* 298 Fed.Appx. 916, 923 (11th Cir.2008) (finding that where one defendant did not use excessive force, the other defendants did not unlawfully fail to intervene).

Even if Tarpley could establish that a constitutional violation for false arrest occurred, Sergeant Williams lacked sufficient information to put him on notice as to whether Tarpley's arrest was unconstitutional. (Mot. 13, ECF No. 63.) At no time was Sergeant Williams present at the Flea Market. Further, the entire "takedown," i.e., the time it took Officers Jose and Hector Sanchez to handcuff Tarpley, took fifteen seconds at most. As a result, Sergeant Williams had no time to gather any facts concerning Tarpley's arrest, and Sergeant Williams lacked any information to determine whether the officers had probable cause for Tarpley's arrest. Therefore, even if the other officers lacked arguable probable cause to arrest Tarpley, Sergeant Williams would be entitled to qualified immunity on Tarpley's failure to intervene claim. *See Wilkerson v. Seymour,* 736 F.3d 974, 980 (11th Cir.2013) (finding that because the defendant sergeant "lacked the requisite information to put him on notice that an unlawful arrest was occurring or had occurred[,]" the district court incorrectly denied summary judgment).

### B. State Law Claims for False Arrest (Count 8), Intentional Infliction of Emotional Distress (Counts 9 and 10), and Loss of Consortium (Count 12)

Only the state law claims for false arrest, intentional infliction of emotional

distress, and loss of consortium remain. (Second Am. Compl. 16–18, ECF No. 38.) Independent of Tarpley's federal claims, the Court does not have jurisdiction over these state law claims. While it was initially appropriate for the Court to retain jurisdiction of these claims under 28 U.S.C. section 1367(a), a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

■■■ "State courts, not federal courts, should be the final arbiters of state law." *Baggett v. First Nat Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir.1997). Because the Court has disposed of Tarpley's federal claims, and the remaining claims depend on determinations of state law, the Court declines to retain jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction.").

■■■ "When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court." *Ingram v. Sch. Bd. of Miami–Dade Cnty.*, 167 Fed.Appx. 107, 109 (11th Cir.2006) (citation omitted) (affirming district court's dismissal of state law claims after the district court granted summary judgment as to the federal claims). Now that the Court has granted summary judgment on Tarpley's federal claims, the Court dismisses without prejudice Tarpley's state law claims. *See Lehman v. Lucom*, No. 11–23479–CIV, 2012 WL 1802435, at *7 (S.D.Fla. May 17, 2012) (Scola, J.), *Aff'd*, 727 F.3d 1326 (11th Cir.2013) (granting the defendant's motion for summary judgment on the federal claims and declining to exercise supplemental jurisdiction over the remaining state claims).

## 4. Conclusion

For the reasons set forth above, the Court **grants in part** the Defendants' Motion for Summary Judgment (ECF No. 63) as to Counts 1 through 7 and Count 11 of the Second Amended Complaint. Because the Court declines to exercise supplemental jurisdiction as to the remaining state law claims, the Court **dismisses without prejudice** Counts 8, 9, 10, and 12 of the Second Amended Complaint and **denies in part** the Defendants' Motion for Summary Judgment (ECF No. 63) as to those Counts. In accordance with Federal Rule of Civil Procedure 58, the Court will enter a separate final judgment order.

**Done and ordered,** at Miami, Florida, on July 20, 2016.